IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 10, 2021 Session

**STATE OF TENNESSEE v. SIMON DEAN PORTER**

**Appeal from the Circuit Court for Lawrence County**
**No. 35602     Stella L. Hargrove, Judge**

_____

**No. M2020-00860-CCA-R3-CD**

_____

A Lawrence County Grand Jury indicted the Defendant, Simon Dean Porter, for aggravated rape of a child and aggravated child abuse of his sixteen-month-old son. A jury convicted the Defendant as charged, and the trial court imposed an effective sentence of eighty-five years. See Tenn. Code Ann. §§ 39-13-531, 39-15-402(a)(1). On appeal, the Defendant argues: (1) the trial court erred in admitting deoxyribonucleic acid (DNA) proof connecting him to these offenses; (2) the trial court abused its discretion in admitting photographs of the victim's injuries; (3) the evidence is insufficient to sustain his convictions; and (4) the trial court abused its discretion in imposing consecutive sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Brandon E. White (on appeal), Columbia, Tennessee; Travis Jones, District Public Defender; and William M. Harris and Robert H. Stovall (at trial), Assistant District Public Defenders, for the Defendant-Appellant, Simon Dean Porter.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Emily Crafton, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The charges in this case arose after the Defendant sodomized the victim, his sixteen-month-old son, M.B.,[1] which resulted in the victim's severe anal and rectal injuries and broken legs. The Defendant was the sole male caregiver during the relevant time period,

_____

[1] It is the policy of this court to refer to minor victims by their initials only.

and a diaper containing a high concentration of semen and the victim's blood was found in the Defendant's outdoor garbage can. DNA testing matched the semen in the diaper to the Defendant. After his first interview with police on the night the victim was hospitalized, the Defendant fled to Alabama. The Defendant was arrested there while walking down a road, and the Defendant's truck was later found hidden in the woods nearby.

On January 30, 2020, the Defendant filed a motion to suppress his statements to police as well as a motion to exclude or limit photographs of the victim's injuries. Following a hearing, the trial court suppressed the statements made by the Defendant during his police interviews based on the totality of the circumstances, particularly given that the Defendant told the officers he could not read or write well, that the Defendant had only completed the eleventh grade in special education classes, and that the officers never informed the Defendant of his charges. The trial court also determined that five of the fifteen photographs were admissible because they assisted the jury in understanding the "full impact and full injuries" sustained by the victim and because "their probative value substantially outweigh[ed] their prejudicial effect."

On February 10, 2020, during a hearing immediately prior to the start of trial, the defense argued[2] a motion to suppress/exclude DNA evidence and related expert testimony. After listening to the recordings of the Defendant's statements, hearing testimony from Detective Blake Grooms, and considering the parties' arguments, the trial court held that the Defendant's consent for the buccal swab of his DNA was not freely and voluntarily given. Nevertheless, the trial court denied the motion to suppress, finding that "pursuant to Nix v[.] Williams, [467 U.S. 431 (1984),] the DNA would have been eventually discovered by legal authority, statutory authority, pursuant to 40-35-321(e)."

**Trial.** Lura McCandless, who routinely cared for the victim and his sister at the time of this incident, testified that she had fostered hundreds of children over the years. She stated that the Defendant and his wife and co-defendant, Danielle Bowen, were the children's biological parents and that she knew the Defendant because she had fostered and later adopted the Defendant's two eldest children. As of the date of trial, McCandless had also adopted the victim and his sister.

McCandless allowed the Defendant and Bowen to have overnight visitation with the victim and his sister "once or twice a month" while the Defendant and Bowen worked on their relationship. From June 2018 to November 2018, the Defendant and Bowen never

---

[2] Following a remand by this court, the trial court entered an order stating that trial counsel had argued, but inadvertently never filed, this suppression motion. The trial court allowed a copy of this suppression motion to be filed in the Lawrence County Circuit Court Clerk's office and directed the clerk's office to prepare a supplemental appellate record including this motion and transmit it to the Appellate Court Clerk's Office.

kept the children for more than a single night per visit until the weekend of November 10, 2018.

McCandless said that on Saturday, November 10, 2018, the Defendant and Bowen picked up the victim and his sister. She expected them to return the children the next morning, and when that did not happen, she contacted Bowen, who stated that she was off work the next day and wanted to keep them a second night. McCandless asked whether the children were okay, because she had seen Bowen's Facebook post that the victim had fallen in the bathtub on Saturday night, and Bowen stated that the children were fine but that the victim "was constipated" and "had some trouble with some stools." Bowen never indicated that the victim had bled or was hurt. McCandless acknowledged that constipation had been a problem for the victim that they treated with MiraLAX. She noted that the Defendant would occasionally leave a pink stain on his diaper from going to the bathroom, and his bowel movements would sometimes look like "little pebbles," but nothing worse.

McCandless stated that Bowen did not return the children on Monday. When McCandless talked to her, Bowen "promised everything was fine" and asked to keep them "one more night" because they were "having a good time." Bowen also told her that the victim's constipation was "all better," and McCandless agreed to pick up the children on Tuesday at noon.

When McCandless came by to get both children on Tuesday, she said the victim was "clinging and whiny" and did "not want[] to sit down in the car seat." She later determined that she needed to change the victim's diaper, and the victim began "screaming and crying and throwing a fit" because "[h]e didn't want to be changed." McCandless described what she observed when she removed the victim's diaper:

> [Being] in child care as many years as I have, I've seen a lot of horrendous diaper rashes where the babies['] bottoms would bleed[,] but I've never seen a child's little bottom ripped open like it was. And I knew the moment I saw it that something horrible had happened to him.

McCandless immediately called Bowen to ask what happened, and Bowen replied that the victim had been constipated. McCandless said she knew what constipation looked like after taking care of hundreds of children and accused Bowen and the Defendant of hurting the victim. McCandless stated that she and her daughter were taking the victim to the hospital in Lawrenceburg. When Bowen said that she and the Defendant would meet them at the hospital, McCandless told her to "not come near this child[,] and I mean it." Upon arriving at the hospital, McCandless told the hospital staff that she believed the victim "had been molested" because "his little rectum was ripped wide open."

- 3 -

McCandless said that when the Defendant and Bowen walked into the hospital, she "put [her] hand up like that[,]" and the Defendant "backed off, he knew." Although Bowen came in and tried to take the victim away, McCandless and her daughter prevented her from taking the victim. McCandless said that she and Bowen argued for a while, but the Defendant never asked her any questions.

The hospital in Lawrenceburg immediately sent the victim and McCandless to Vanderbilt, where a rape kit was performed and doctors operated on the victim's anus and rectum that same night. McCandless was later informed that both of the victim's legs were broken at the kneecaps. She said that while the victim was with her, she never saw him fall. McCandless admitted that the victim was walking the morning after his surgery. She acknowledged that the fractures in the victim's legs did not require treatment, but she said these fractures required several follow-up appointments, so doctors could determine whether they were healing properly.

Sylvia Lindsay, a nurse at the Lawrenceburg hospital, testified that the victim refused to cooperate with a physical examination and did not want anyone to touch him. She said the victim had suffered "obvious trauma" to his rectal area, which included a "large tear, lots of bruising . . . . it looked awful." A physician agreed that the victim's injuries were serious and that the victim needed to go to Vanderbilt Hospital for surgery. Lindsay stated that she had never observed a pediatric injury like the victim's and that it was "heart wrenching." Lindsay said McCandless informed her that the victim's parents were in the waiting room, so she called the police. When McCandless told her that Bowen had suggested that the victim's injuries were from constipation, Lindsay knew the victim's injuries were not from "anything similar to that."

Leanna Dugan, a nurse practitioner at Our Kids Center, was accepted as an expert in the field of child sexual abuse. She explained that Our Kids Center was an outpatient clinic of the Nashville General Hospital where children are examined when there are concerns of sexual abuse. Dugan stated that she examined the victim during the very early hours of November 14, 2019, prior to his surgery at Vanderbilt and discovered that the victim had sustained "significant injuries to his anus" that made the victim not want to comply with an examination. She described the victim's injuries, stating:

[There was] a lot of bruising around [the victim's] anus.

Typically, . . . everybody has muscles on their anus that create[] those little wrinkles that you see around the bottom to kind of keep it tight. And [the victim's] muscles were not working properly so everything was very relaxed and kind of open.

But the most impressive or significant injury was a very deep cut or laceration to his bottom. So if you are looking at him with him on his back and legs up, it was kind of down at—if it was like a clock, like at the seven o'clock position there was a significant tear.

She noted that the victim also had a "shallow laceration" at the "twelve o-clock position." Dugan said she had seen such a severe injury only a couple of other times. She described the victim's larger laceration as a "deep . . . penetrating trauma" that extended as far inside the victim's rectum as she could see and that she was unable to see where the trauma ended.

Dugan identified five photographs she took of the victim's injuries and used all of these photographs to demonstrate and explain the victim's injuries, including the multiple areas of bruising, the relaxed muscles of his anus that allowed the inside of the rectum to be visible, the deep laceration that extended into the rectum, and the shallow laceration around the anus. Dugan said that although it was common for toddlers to become constipated and sustain a small slit to the anus, which would result in some minor bleeding, she said that constipation could not have caused the victim's severe injuries. She said that while the victim's injuries were rare, it was extremely rare that such injuries would require surgery. She noted that she collected a buccal swab from the victim as well as perianal swabs for the rape kit. Dugan opined that the victim's injuries, which included "the bruising, the lack of muscle tone, and the laceration[s], combined, [were] consistent with penetrating trauma." However, she acknowledged that she could not determine the cause of the penetrating trauma.

Dr. Heather Williams, a pediatrician with the child maltreatment team of Vanderbilt Children's Hospital, was accepted as an expert in the field of child abuse pediatrics. She testified that she had examined hundreds of children for physical and sexual abuse and rarely saw such serious injuries as the victim's. She said the victim's case was different because child sexual abuse victims typically did not require surgery. Dr. Williams stated that a skeletal survey showed the victim "had factures on the ends of both of his femurs near his knees." She explained how such fractures, which she described as "corner" fractures, could have been inflicted, stating:

[T]hose fractures would either be from a forceful yanking and twisting of the legs or, when we see it with abusive head trauma in children, it's from the forceful flailing of the arms and legs because it's at that part of the bone, and these kiddos are . . . no more than about a year, year and a half old, that's really susceptible because of that rapid growth [there].

Dr. Williams stated that factures like the ones sustained by the victim were "very specific for abuse" unless there was "a very clear accidental way that it happened," such as forcefully yanking a baby out during a caesarian delivery. She opined that the victim's anal trauma was consistent with sexual abuse and that the "corner" fractures were consistent with physical abuse, absent a "very clear, exceedingly rare accidental history[.]" She acknowledged that it was difficult to determine the date the victim's corner fractures occurred, given that they were located at the growth plate. However, she disagreed that these fractures were a month old because they had completely healed two weeks after she first observed them. Dr. Williams said it was not unusual that the victim could still walk because these fractures were "subtle" fractures in an area that was growing rapidly. She asserted that a fall in the bathtub could not cause these fractures, and there was nothing in the victim's medical history that would explain them. Regarding the victim's rectal injuries, Dr. Williams opined that constipation could not account for these injuries. She said that "a laceration that requires surgical repair would not be consistent with passing a hard stool or constipation" but would be consistent with "anal penetrated trauma." Dr. Williams concluded that the victim had suffered both sexual abuse and physical abuse.

Officer William Jewett with the Lawrenceburg Police Department testified that when he responded to the hospital in Lawrenceburg, he was informed that the victim had "severe rectal tearing." He approached the Defendant and Bowen in the hospital parking lot. The Defendant asked no questions about what was happening as Officer Jewett escorted him back inside the hospital. When asked if the Defendant was upset or angry at the time, Officer Jewett replied, "[T]he little contact I had with him, he didn't seem to be anything."

Officer Jewett said that once Detective Blake Grooms arrived at the hospital, they escorted the Defendant and Bowen to the police station where interviews were conducted. Although Officer Jewett could not recall whether the Defendant and Bowen were separated on their way to the police station, he said that once they arrived at the station, the Defendant and Bowen were either separated or supervised by an officer. At the conclusion of these interviews, Officer Jewett took Bowen and the Defendant back to the hospital to get their car and then followed them to their apartment, where detectives searched the home. Officer Jewett said that after the police completed this search, an officer told him to stand with the Defendant's and Bowen's outdoor garbage can until the police could return with a larger vehicle to transport the garbage can to the station.

Detective Blake Grooms with the Lawrenceburg Police Department testified that he responded to a call at the hospital that the victim had sustained "some type of violent penetration." He said that while he was at the hospital, neither the Defendant nor Bowen asked him about what was happening or what was wrong with the victim; instead, they were not "talking or saying anything." Detective Grooms said that later that night he

obtained a buccal swab from the Defendant and sent it to the Tennessee Bureau of Investigation (TBI) so agents could develop a DNA profile for the Defendant and compare it to DNA found on items collected as evidence.

Detective Grooms said that on November 14, 2018, he obtained consent from the Defendant and Bowen to search their apartment. During this search, the Defendant's underwear and some small, child-sized pants were found, although no blood or semen was discovered on either of these items. After searching this apartment, Detective Grooms noticed the Defendant's and Bowen's city issued garbage can at "the back of the complex, right next to the sidewalk[.]" He believed this particular garbage can belonged to the Defendant and Bowen because it was "in line with their back porch, like the other trash cans" for the apartments at the complex. He acknowledged that the garbage can was not sitting at the curb; instead, it was positioned on the ground between the sidewalk and the back porch. Detective Grooms carried the garbage can out to the street and asked Officer Jewett to stay with it so no evidence would go missing while he retrieved a vehicle large enough to carry the garbage can back to the station. Once Detective Grooms transported the garbage can to the police station, he took it to a closet, sealed the crack under the door, zip-tied the door handles to the closet, and wrote his name on the evidence tape that sealed the door to the closet. A day later, he sealed the top of the garbage can with a plastic bag and re-secured it in the closet.

On November 26, 2018, Detective Grooms went through the contents of a garbage can and found a diaper "with a large reddish brown streak . . . that appeared to be blood" as well as a wipe that appeared to have blood on it. The diaper and the wipe were admitted into evidence.[3] He said that both of these items were soaking wet. He called the TBI, who told him to store the diaper and wipe in an area that was warm and had airflow so these items could dry. After complying with these instructions, he sent the diaper and wipe to the TBI to be tested for blood and semen on November 29, 2018. He also picked up the victim's rape kit from Leanna Dugan and sent it to the TBI.

Detective Grooms said that no condoms or condom wrappers were in the garbage can, which he had been looking for, given the sexual nature of the offense. He said the

---

[3] The defense objected to admission of the diaper and wipe at trial. During a hearing outside the presence of the jury, the trial court stated that it did not recall an objection to the consent to search the home. The State asserted that the parties had already discussed the fact that Bowen had also signed the consent form for the search of the home, which included "[a]ll items and property about [the home's] premises," and defense counsel clarified that he was not objecting to everything taken from the home and asked to withdraw that objection. Instead, defense counsel explained that he was objecting to the admission of the Defendant's buccal swab; he argued that because "[t]he wipe[] and the diaper w[ere] where [the police] got . . . the semen to compare [to the Defendant's] buccal swab[,]" admission of the diaper and the wipe "would be objectionable to that extent." The trial court overruled this objection.

trash can did contain a pair of jeans with a stain that appeared to be blood, which he collected as evidence.

Detective Grooms said that at noon on November 14, 2018, he obtained an arrest warrant for the Defendant, and when he attempted to arrest the Defendant pursuant to this warrant, it became obvious that the Defendant had fled. After an alert was given, the Defendant was arrested in Scottsboro, Alabama, on November 18, 2018, although the Defendant's truck was not located until later. Detective Grooms said he eliminated Bowen as a suspect on the aggravated rape of a child charge, but he did charge Bowen with aggravated child abuse and neglect.

Detective Rick Bailey with the Lawrenceburg Police Department testified that he and Detective Grooms found several diapers in the trash can. He stated that the diaper that appeared to have blood on it was rolled up and taped into a ball, like most of the other diapers. He said he did not find any condoms in the trash can.

James Sentell, a surveyor in Jackson County, Alabama, testified that while he was surveying some property in that area, he discovered the Defendant's truck "backed off in the bri[a]rs on the side of a logging road" a quarter of a mile from the road. He noted that the truck was not easy to see, and he missed it at first. He also observed several takeout food containers scattered around the truck, as if someone had spent some time there.

Jackson County Sheriff's Deputy Jimmy Jones testified that he responded to James Sentell's call about the hidden truck. He noted that there was garbage lying on the ground around the truck, and he could tell it was not just abandoned because there were fresh marks where it appeared someone had attempted to back it out, and the truck had gotten stuck. Deputy Jones said the truck was found approximately two hours from Lawrenceburg, Tennessee. Because mail inside the truck listed a Lawrence County address, he called the Lawrence County Sheriff's Department, who determined that the truck belonged to the Defendant.

Agent Beth Sulpy, a forensic scientist at the TBI crime lab, was accepted as an expert in the field of forensic serology testing. She stated that her testing revealed the presence of blood and a very high concentration of semen on the diaper. She explained that she did not test the wipe or the child's pants because the diaper tested positive for blood and semen. In addition, she said the Defendant's jeans did not indicate the presence of blood, and the Defendant's underwear did not indicate the presence of blood or semen. Agent Sulpy acknowledged that bodily fluids can transfer between items if they are in contact; however, she did not find it likely that the semen could have been transferred to something else because "there was quite a bit of concentration of semen in the diaper." She stated it was "possible" that semen from the wipe could have transferred to the diaper

if they were found together in a garbage can that was wet inside. Nevertheless, she found this scenario unlikely because of the very high concentration of semen in the diaper. Agent Sulpy said that a transfer of sperm from one item to another would be countable, "somewhere in the 10 to 20 range, if even that." However, she said that with the diaper she tested, "[I]t was almost uncountable the number of sperm cells that I saw . . . across the entire slide."

Agent Militza Kennedy, a forensic scientist at the TBI crime lab, was accepted as an expert in the field of forensic biology and DNA analysis. She testified that the Defendant was the major contributor for the DNA in the sperm cells in the diaper, and there was insufficient information to match the other contributor, whose DNA was not necessarily associated with the sperm. However, Agent Kennedy said the victim's perianal swabs tested negative for the presence of semen. She said her findings were consistent with a person ejaculating into the rectum or anus of a child and then placing a diaper on the child. In addition, she said that the victim was the major contributor of the blood in the diaper.

The Defendant, Simon Dean Porter, testified that he was thirty-five years old and had completed the eleventh grade in special education classes. He said he worked in carpentry and plumbing and that Danielle Bowen, his wife, was the mother of both the victim and his younger daughter. He admitted that he was the only one who cared for the children while Bowen was at work the weekend of November 10, 2018.

The Defendant said that on the night of Saturday, November 10, 2018, he and Bowen had sex after they put the children to bed in their separate bedrooms. He said that he used a condom and that Bowen took the used condom into the bathroom. He did not know what she did with the condom but acknowledged there was a trash can in the bathroom.

The Defendant stated that on Sunday, November 11, 2018, while Bowen was working, the victim began crying and seemed to be straining to make a bowel movement because he was constipated. The Defendant said he removed the victim's diaper and saw a partial stool coming out, so he inserted his finger into the victim's anus about halfway to remove the stool. The Defendant stated that he did not notice any injuries to the victim's rectal area because he was "not paying attention," given that the victim was "crying" and "moving around." However, the Defendant acknowledged seeing some blood on his finger when he removed the victim's stool. He said that he "was afraid [he] might have accidentally ripped his anal butt, anal cavity[,]" although he did not do a close examination of the victim. The Defendant then wiped the victim's rear, put the wipe into the diaper, and put the diaper into the trash can in the bathroom. He said that when Bowen returned from work, he told her that the victim passed some stool and there was a little blood in his

stool, but he never told her that he had used his finger to remove the stool. He noted that he and Bowen stayed with the children on Monday and Tuesday, and McCandless came to pick up the children on Tuesday.

The Defendant said that he became afraid when the police interviewed him about the victim on November 13, 2018. He stated that he went to Alabama to work for Bart Lane's Plumbing, left his truck at a jobsite, and was later arrested while walking to get something to eat. He claimed he had no idea how his truck ended up in a remote area of the woods because he left his truck, which was having mechanical problems, at a job site, although he was unable to explain where this job site was located. He claimed that someone must have stolen his truck, although he admitted that he never called the police to report it stolen. The Defendant acknowledged that he had not issued a subpoena for his employer Bart Lane; however, he claimed that neither of his attorneys ever asked him why he was in Alabama. He claimed it was merely a coincidence that he left town the day after the victim was seriously injured and he was interviewed by police.

The Defendant said he told the police in Alabama that he was walking to his aunt's house when he was arrested, but the officer never asked him why he was in Alabama in the first place, which was to work for Bart Lane Plumbing. He said he did not know that the police were looking for him. Although the Defendant admitted that he had a cell phone with him, he maintained that it did not work, and he denied disabling it to avoid being captured. The Defendant also denied that Lura McCandless was fostering his children because he and his wife could not stop using drugs. Instead, he claimed that McCandless was caring for his children because his mental disability kept him from keeping a job or handling his finances.

The Defendant acknowledged that he was the only adult present when the victim had his constipation problem. He admitted that although they normally gave the victim MiraLAX to treat his constipation, and he had some MiraLAX available, he put his finger into the victim's rectum to remove the stool instead. The Defendant claimed that he never meant to rip the victim's anus and asserted that it was an accident. He denied grabbing and spreading the victim's legs apart. The Defendant also denied anally raping and ejaculating into the victim, although he was unable to explain how his semen was found in the victim's diaper.

**Sentencing.** At the Defendant's sentencing hearing, the presentence investigation report was admitted. Proof was offered showing that the Defendant had three prior misdemeanor convictions for theft, misappropriation of rental property, and a seatbelt violation and that the Defendant had violated his probation for the theft conviction and had his probation revoked. The Defendant self-reported that his mental and physical health was "fair" but that he was mentally disabled and had a learning disability. The Defendant

also stated that he had been diagnosed with bipolar disorder but was not taking any medications for this condition. He said he received Social Security disability and worked a couple of jobs to supplement his income. Only some of the Defendant's employment history was verified. The Defendant declined to provide a statement regarding his convictions in this case. The Defendant's "Strong R" assessment put him at a low risk to reoffend.

Lura McCandless testified that the victim, who was now three years old, was "scared of everyone" and "[w]hen he comes in contact with men, he goes into fight or flight mode, even the people [who] have been around him his whole life." She also said although the victim had been to therapy, he was "angry all the time[,]" and would fight, hit, and bite. She said the victim had trouble sleeping and often had nightmares that caused him to scream in his sleep. McCandless acknowledged that the victim's physical injuries had healed; however, she asserted that the victim would be "traumatized, terrorized for the rest of his life because of what was done to him." She also said that if the surgery had not been successful, the victim would have had to wear a colostomy bag for the remainder of his life. In response to questioning by the trial court, McCandless asserted that the victim's rectum had been "ripped open" and that it looked like "a blooming flower." She said the victim had to go to many follow-up appointments at Vanderbilt hospital to monitor whether the fractured bones in his legs were healing.

Detective Grooms testified that this was the "worst case [of] child sexual abuse" he had seen. He stated, "I am afraid that [the Defendant] will re-offend if he is a free man, based on what he has done to his own son."

Gabriele Dixon, a witness for the defense, testified she met the Defendant when he was homeless and wanted to improve his life, and with her help, the Defendant began going to church and was making better choices. She said the Defendant was a very hard worker and helped people without asking for anything in return. Dixon admitted that she had known the Defendant for only a year and a half prior to the crimes in this case. Although Dixon claimed that she had participated in only two video visitations with the Defendant, jail records showed that she had taken part in at least fifteen video visitations with him. Nevertheless, Dixon denied any romantic relationship with the Defendant.

After hearing arguments from the State and the defense, the trial court applied and gave great weight to seven enhancement factors with regard to the aggravated rape of a child conviction, namely that the victim was particularly vulnerable because of age or physical or mental disability; that the defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense; that the personal injuries inflicted upon the victim were particularly great; that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; that the defendant

had no hesitation about committing a crime when the risk to human life was high; that the actions of the defendant resulted in serious bodily injury to the victim; and that the defendant abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offense. See Tenn. Code Ann. §§ 40-35-114(4), (5), (6), (7), (10), (12), (14). The trial court found that no mitigating factors applied. See Tenn. Code Ann. § 40-35-113. The Defendant chose not to make an allocution in this case.

The trial court reviewed and summarized the trial testimony given by Nurse Sylvia Lindsay, Nurse Practitioner Leanna Dugan, and Dr. Heather Williams regarding the severity of the victim's injuries. The court also noted the testimony from Agent Beth Sulpy and Agent Kennedy, who testified about the presence of semen in the victim's diaper and how this semen matched the Defendant's DNA. The trial court found that the Defendant was "100 percent not credible" and that the Defendant had failed to accept responsibility for the serious injuries, both physical and mental, that he caused his son in this case. The trial court recognized that the victim was "unable to summon help," that the Defendant had caused horrendous injuries, including "a tear so deep that it required surgery on this baby in addition to fracturing both of his [legs]," and that the Defendant had "ejaculated in his baby[,]" which the Defendant did to "gratify his desire for pleasure or excitement." The court noted that although the Defendant "might have a learning disability," the Defendant knew right from wrong, and there was no basis for arguing that the Defendant had diminished capacity. The trial court said it was "appalled" by the "Strong R" assessment that the Defendant was a low risk to reoffend. After noting that ninety-five percent of the information considered in the "Strong R" assessment was provided by the Defendant, the trial court dismissed each one of the findings made in the assessment before sentencing the Defendant.

As to whether the sentences should be served consecutively, the trial court stated:

The Court finds . . . that under [Code section] 40-35-115[(b)](4), this defendant is a violent and dangerous offender, he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

Further, the Court finds that all of the three following factors apply: A, the circumstances surrounding the commission of the offense are aggravated; B, the confinement for an extended period of time is necessary to protect society from this defendant's unwillingness to lead a productive life and his resort to criminal activity in furtherance of an anti-societal lifestyle, and; C, the aggregate length of the sentences reasonably relates to the offense[s] of which the defendant stands convicted.

- 12 -

Also, the [State v. ]Wilkerson[, 905 S.W.2d 933 (Tenn. 1995),] factors I need to put on the record for consecutive sentencing. The Court finds that they apply in that . . . [n]umber one, an extended sentence is necessary to protect society against further criminal conduct of this defendant; and, number two, consecutive sentencing is reasonably related to the severity of the offenses committed.

The trial court then sentenced the Defendant as a Range III, persistent offender to sixty years at one hundred percent for the aggravated rape of a child conviction and as a Range I, standard offender to twenty-five years at one hundred percent for the aggravated child abuse conviction and ordered these sentences served consecutively to one another for an effective sentence of eighty-five years. See Tenn. Code Ann. §§ 39-13-531, 39-15-402(a)(1), 40-35-501(i) (Supp. 2018). The judgments of conviction were entered on May 15, 2020. The Defendant then timely filed a motion for new trial, arguing that the evidence was insufficient to sustain his convictions; that the trial court erred in admitting DNA evidence, lab tests, and expert testimony pertaining to the DNA evidence; that the trial court erred in admitting photographs of the victim's injuries over the defense's objections; and that the trial court's imposition of an eighty-five-year sentence was excessive. Following the trial court's denial of this motion, the Defendant timely filed a notice of appeal.

**ANALYSIS**

**I. DNA Proof and Related Expert Testimony.** The Defendant argues that the trial court erred in admitting DNA evidence at trial after determining that it would have been inevitably discovered pursuant to Code section 40-35-321(e). He also contends that this statute is facially unconstitutional and unconstitutional as applied to him. Finally, the Defendant asserts that the inevitable discovery doctrine does not apply because although the State could have obtained his DNA via a search warrant prior to trial, there was no evidence the State would have done this. The Defendant maintains that the trial court's error in failing to suppress this evidence constituted a non-structural constitutional error that requires reversal unless the State establishes beyond a reasonable doubt that the error is harmless. See State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008).

In response, the State argues that the Defendant waived the constitutional challenge to Code section 40-35-321(e) by failing to include it in his motion for new trial and that the Defendant cannot establish plain error because this statute has not been previously found unconstitutional. It asserts that because the Defendant cannot successfully challenge

the constitutionality of Code section 40-35-321(e), the State was entitled to take the Defendant's DNA pursuant to that statute, thereby curing any deficiencies regarding the DNA swabbing. In addition, the State contends that the Defendant's DNA would have been inevitably taken via a search warrant, if the Defendant had not consented to a DNA sample during his interview with police. Lastly, the State maintains that even if there were some error regarding the Defendant's DNA swab, this error was "harmless, given the amount of concentrated semen found in the victim's diaper and the undisputed fact that the [D]efendant was the sole male caregiver in the victim's home." We conclude that the DNA evidence would have been inevitably discovered pursuant to Code section 40-35-321(e). We also conclude that the Defendant waived any issues regarding Code section 40-35-321(e)'s alleged unconstitutionality and that he failed to show he is entitled to plain error relief. Finally, we conclude that the DNA evidence also would have been inevitably discovered pursuant a search warrant.

**Suppression Hearings.** Prior to trial, the Defendant filed a motion to suppress his statements during the police interviews on the basis that they were obtained in violation of the Fifth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. At the February 6, 2020 hearing on this motion, the trial court suppressed the Defendant's statements based on the totality of the circumstances, especially given that the Defendant told the officers he could not read or write well, that the Defendant had only completed the eleventh grade in special education classes, and that the officers never informed the Defendant of his charges.

Following this ruling, defense counsel argued that because the Defendant requested an attorney before the police asked him to provide a buccal swab, anything that occurred after the Defendant invoked his right to counsel, including the collection of the Defendant's buccal swab, should be excluded. The State replied that the Defendant had signed a consent form for the buccal swab, voluntarily providing his DNA sample on November 14, 2018, and that the Defendant was not arrested until November 18, 2018. The State also asserted that at the time that this buccal swab was taken, the Defendant was not in custody, and his Miranda rights[4] had already been read to him. The trial court stated that it was going to reserve ruling on the issue of suppression of the Defendant's buccal swab and related DNA evidence until it saw research from both parties on this issue.

On February 10, 2020, during a hearing immediately prior to the start of trial, defense counsel argued that once the Defendant unequivocally invoked his right to counsel, all police questioning should have stopped, but it continued in this case, and the Defendant "was not really given a choice about whether he was going to provide a DNA swab" because the police told him it was "protocol." Defense counsel noted that Detective

---

[4] See Miranda v. Arizona, 384 U.S. 436 (1966).

Grooms completed the consent form while Captain Brent Hunter talked to the Defendant about unrelated subjects and then the Defendant was handed the form and told to "sign right here and date it." Defense counsel argued that because the Defendant made an unequivocal request for an attorney during his first interview, the Defendant's buccal swab collected at the end of the first interview should be suppressed.

In response, the State argued that the first interview, which began late on November 13 and continued into the early hours of November 14, was not a custodial interrogation and that the Defendant was not under arrest at that time, although the police did read the Defendant his Miranda rights. It also asserted that the Fifth Amendment does not apply to consents to search because they are not testimonial in nature and that "whether there was an earlier Miranda violation [wa]s really irrelevant to the consent issue." Instead, the State maintained that the pertinent issue was "whether the consent was freely and voluntarily [given]." Alternatively, the State argued that even if the trial court found that the Defendant's consent was not voluntary, the Defendant's DNA would have been collected pursuant to the inevitable discovery doctrine. It noted that after the police discovered the extensive nature of the victim's injuries and realized that the Defendant had fled, an arrest warrant for the Defendant was issued. The State claimed that once the Defendant was arrested for the aggravated rape of a child offense, then it became mandatory that a DNA swab from the Defendant be collected pursuant to Code section 40-35-321(e).

At a later hearing outside the presence of the jury but prior to the jury being sworn, the trial court observed a video recording of the Defendant's first interview. The State also presented testimony from Detective Grooms, who said that the recording depicted the Defendant stating that he wanted an attorney because he was being accused of something he did not do and that he had only stuck his finger in the victim's rear to help him go to the bathroom, which he had mentioned earlier in the interview. Detective Grooms stated that when he told the Defendant it was "protocol" to collect a DNA swab, he meant that "when it comes to sexual assault crimes and sexual crimes against children, if you have a suspect readily available, we need to get a DNA swab to establish a DNA profile to either confirm or exclude the person we are looking at as a suspect through their DNA." He said that individuals who commit certain offenses are "swabbed" when they are arrested or booked at the jail. Detective Grooms acknowledged that when he collected the Defendant's swab, the Defendant had not been arrested. He stated that a few hours after this first interview, he obtained an arrest warrant for the Defendant for the offense of aggravated rape of a child and intended to arrest the Defendant for that offense. He stated that he believed that any person arrested for a major sexual offense is swabbed whenever they go to jail.

Detective Grooms asserted that the Defendant and his wife, Danielle Bowen, consented to a search of their apartment on November 14, 2018, and the same day, the police collected the Defendant's city garbage can, which was sitting along a walkway

- 15 -

where all the garbage cans for the apartment complex are placed. He took this garbage can to the police station, where it was sealed with evidence tape and zip-ties and secured in a closet. He said that it was not until November 26, 2018, when he and another officer "processed" the garbage can, that they found the bloody diaper and wipe. He agreed that all the items inside this garbage can were wet and that these items had been sitting inside the garbage can for twelve days at the police station before the garbage can was actually searched. Detective Grooms said that because the diaper and the wipe were wet, the TBI had instructed him to place them in a secured location where they could dry before they were forwarded for testing. He agreed that if he had not already swabbed the Defendant at his first interview, he would have been able to obtain a search warrant for the Defendant's DNA "[q]uite quickly" once the TBI determined that there was blood and semen in the diaper.

Detective Grooms acknowledged that during the interview, the Defendant said that he would take a lie detector test but that he wanted an attorney, too, and Captain Hunter asked if he was requesting an attorney, and the Defendant replied, "Yes." Detective Grooms stated that although he understood the Defendant's statement to be an unequivocal request for an attorney, he was unsure whether the Defendant was talking about requesting an attorney for the lie detector test or requesting an attorney in general. Regarding the buccal swab, Detective Grooms admitted that he told the Defendant, "We have to have one so is it okay with you if we knock that out now?" He admitted that he never told the Defendant that he had a right not to consent to the buccal swab and he never read the portion of the consent form, which explained that the Defendant had a right to refuse consent. Detective Grooms also admitted that he simply put the consent form in front of the Defendant and asked him to sign it. He said that at the time he asked for the Defendant's consent to obtain a buccal swab, he did not have any evidence indicating the presence of DNA. He also said that when the Defendant was brought to the jail following his arrest, he did not ask the jailers to collect a buccal swab from the Defendant.

Detective Grooms stated that during his investigation he obtained a search warrant for the Defendant's truck and cell phone. He acknowledged that he never attempted to obtain a search warrant for the Defendant's DNA after he found the diaper on November 26, 2018, in the Defendant's city garbage can. Although he informed the Defendant of his Miranda rights prior to the start of the November 13 interview, he did not read the last paragraph of the form that states, "I have read this statement and I understand what my rights are . . . ," because he was afraid the Defendant would not have understood some of the words in that paragraph, including the word "coercion." He stated that although the Defendant was free to go at any time during the first interview on November 13-14, he did not recall telling him he was free to go and acknowledged that the Defendant and his wife were separated when they arrived at the police station. Detective Grooms stated that all of the information he put in the search warrant affidavits for the Defendant's truck and cell

- 16 -

phone was still true and that there would be nothing to prevent him from using the same facts to obtain a search warrant for the Defendant's DNA today. He said that when he arrests a person and takes them to the jail, he "leave[s] it up" to the jailers to determine whether to swab that person. However, he stated that if the jailers had not swabbed the Defendant in this case, there was nothing preventing the jailers from swabbing the Defendant right then.

At the conclusion of this testimony, the State, citing State v. Christopher Michael Hooten, No. M2012-00979-CCA-R3-CD, 2013 WL 5436712 (Tenn. Crim. App. Sept. 27, 2013), argued that the Fifth Amendment and Miranda do not come into play when an officer asks for a consent to search and that simply because there is a Miranda violation does not mean that a subsequent consent to search is invalid. The State first asserted that the buccal swab was obtained with the Defendant's consent, even though Detective Grooms had made the consent sound like it was "mandatory" in light of police "procedure." However, the trial court held that the Defendant's consent for the buccal swab had not been freely and voluntarily given.

The State next maintained that the Defendant's DNA would have been obtained under the doctrine of inevitable discovery, either pursuant to Code section 40-35-321(e) or pursuant to a search warrant following the TBI's determination that there was semen and blood on the diaper collected as evidence. Defense counsel replied that Code section 40-35-321(e) "does not apply in this case because he never made bond" and that "there would not have been any DNA taken unless he had tried to make bond[,]" in which case his DNA would have been obtained "before he was released." Upon hearing this, the State asserted:

[Code section 40-35-321(e)(1)] says the person shall have a biological specimen taken and . . . that obligation starts on the arresting agency at the time probable cause is found either by a magistrate or the grand jury.

The part about the Court or the magistrate shall make the provision of a specimen a condition of the person's release is a stopgap. In case the agency hasn't done it yet, well, ooh, let's make sure that it's done. But in this case, the arresting agency already had [the Defendant's DNA swab] so you've got that.

And then as I say, the search warrant situation, it's interesting that the defense says it's speculative to think that [Detective] Grooms would have sought a search warrant after he got this finding from the TBI to get a swab of this defendant when he got two other [warrants], at least, in this case already. The one for the phone records and the one for the vehicle and all.

- 17 -

No evidence that [Detective] Grooms is afraid to get a search warrant or doesn't know how to get a search warrant. He had no need until last Thursday[, when the trial court suppressed the Defendant's statements from his interviews], to even believe that he might need a search warrant.

So I think it's clear that what you would have in this case is inevitable discovery. Your Honor only has to be convinced by a preponderance of the evidence that [the Defendant's DNA inevitably would have been obtained].

And this is actually, as the General points out, it's even a stronger situation than normal. It's not like a search warrant for a house where evidence . . . by the time we get to get to trial wouldn't be there, this evidence is still sitting right there.

This is a mere technicality type argument. The evidence is still right here, it hasn't changed. Your Honor could grant [a search warrant] right now and we could get it sent to the TBI, but that would require a continuance.

The inevitable discovery rule keeps Your Honor from having to do all of those ridiculous things based on a ridiculous argument.

Defense counsel responded that in order to make Code section 40-35-321(e) constitutional, you have to "either get consent [for the DNA sample] or you get a search warrant" He compared this situation to the "DUI cases where we were taking blood samples without consent[,]" and the United States Supreme Court said, "you got to get a search warrant." At the conclusion of the hearing, the trial court "denie[d] the motion to suppress finding that pursuant to Nix v[.] Williams, [467 U.S. 431 (1984),] the [Defendant's] DNA would have been eventually discovered by legal authority, statutory authority, pursuant to 40-35-321(e)." In denying this motion, the trial court did not make a specific ruling as to the constitutionality of Code section 40-35-321(e).

**Applicable Law.** Because the Defendant's arguments regarding the admission of the DNA evidence relate to the trial court's denial of the motion to suppress this evidence, we will consider the following standards when deciding the issues in this case. When this court reviews suppression issues, the prevailing party in the trial court "'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). "'Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" State v. Hawkins, 519 S.W.3d 1, 32 (Tenn. 2017) (quoting Odom,

928 S.W.2d at 23). A trial court's findings of fact in a suppression hearing will be upheld, unless the evidence preponderates against them. Id. (citing State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014)). However, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. Id. at 32-33 (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7. Pursuant to the exclusionary rule, evidence acquired as a direct or indirect result of unconstitutional police conduct will be suppressed as "fruit" of the initial constitutional violation. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391-92 (1920); Wong Sun v. United States, 371 U.S. 471, 484-86 (1963); see State v. Hill, 333 S.W.3d 106, 122-23 (Tenn. Crim. App. 2010). The reason the exclusionary rule was expanded to include evidence that is "the fruit of unlawful police conduct" was "to deter police from violations of constitutional and statutory protections." Nix, 467 U.S. at 442-43.

The "inevitably discovery doctrine" is an exception to the exclusionary rule that allows illegally obtained evidence to be admissible if the State can establish that the evidence in question would have been inevitably discovered by lawful means. Id. at 447-48; Hill, 333 S.W.3d at 123. Before illegally obtained evidence will be admitted pursuant to this doctrine, the State must establish "'first, that certain proper and predictable investigatory procedures would have been utilized in the case at bar, and second, that those procedures would have inevitably resulted in the discovery of the evidence in question.'" State v. Coury, 657 S.W.2d 777, 780 (Tenn. Crim. App. 1983) (quoting Stokes v. State, 423 A.2d 552, 556 (Md. App. 1980)).

"If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[,] then the deterrence rationale has so little basis that the evidence should be received." Nix, 467 U.S. at 444 (footnote omitted). The doctrine of inevitable discovery "'rests upon the principle that the remedial purposes of the exclusionary rule are not served by suppressing evidence discovered through a later, lawful seizure that is genuinely independent of an earlier, tainted one.'" State v. Williamson, 368 S.W.3d 468, 483 (Tenn. 2012) (quoting Hudson v. Michigan, 547 U.S. 586, 616 (2006) (Breyer, J., dissenting) (citations and internal quotation marks omitted)); see United States v. Haddix, 239 F.3d 766, 769 (6th Cir. 2001) (reiterating that "a successful inevitable discovery argument requires the government to proffer clear evidence of an independent, untainted investigation that inevitably would have uncovered the same evidence as that discovered through the illegal search." (citations and internal quotation marks omitted)). In other words, "[t]he ultimate test is whether the evidence would have been discovered through an independent, proper

avenue that comports with the Fourth Amendment." State v. Scott, 619 S.W.3d 196, 204 (Tenn. 2021). "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment[.]" Nix, 467 U.S. at 444 n.5. "[W]hen . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint[,] and the evidence is admissible." Id. at 448.

The United States Court of Appeals for the Sixth Circuit has consistently held that the inevitable discovery doctrine does not apply when law enforcement officers assert that they had probable cause to obtain a search warrant but failed to do so. See United States v. Quinney, 583 F.3d 891, 894-95 (6th Cir. 2009); Haddix, 239 F.3d at 768; United States v. Johnson, 22 F.3d 674, 683-84 (6th Cir. 1994). In Haddix, the Sixth Circuit explained why the inevitably discovery doctrine cannot apply to the mere assertion of probable cause in the absence of a magistrate's determination that probable cause exists:

> "Police officers may not, in their zeal to arrest an individual [or conduct a search], ignore the Fourth Amendment's warrant requirement merely because it is inconvenient." Morgan, 743 F.2d at 1162-63. In this vein, it is appropriate to stress that the Fourth Amendment requires not merely a police assessment of probable cause, but the agreement of a "neutral and detached magistrate." See Johnson v. United States, 333 U.S. 10, 13-14, 68 S. Ct. 367, 92 L. Ed. 436 (1948).

Haddix, 239 F.3d at 768. The Haddix court asserted that reliance on the inevitable discovery doctrine to admit evidence where the police could have obtained a warrant but failed to do so is "untenable" because it would "'completely obviate the warrant requirement[.]'" Id. (quoting Johnson, 22 F.3d at 683-84); see Quinney, 583 F.3d at 894.

**A. Inevitable Discovery of DNA Proof Pursuant to Statute.** First, the Defendant argues that his DNA would not have been inevitably discovered pursuant to Code section 40-35-321(e)(1) because that subsection only mandates that persons arrested for a violent felony provide a biological specimen prior to their release from custody on bond, and he was never released on bond. The State counters that the trial court's ruling does not run afoul of Nix v. Williams, 467 U.S. 431 (1984), State v. Scott, 619 S.W.3d 196 (Tenn. 2021), or Elkins v. United States, 364 U.S. 206 (1960), and that the trial court properly held that the State was permitted to take the Defendant's DNA pursuant to Code section 40-35-321(e), regardless of any independent Fourth Amendment violation.

Tennessee Code Annotated section 40-35-321 states, in pertinent part:

(a) As used in this section, unless the context otherwise requires, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes.

. . . .

(e)(1) When a person is arrested on or after January 1, 2008, for the commission of a violent felony as defined in subdivision (e)(3), the person shall have a biological specimen taken for the purpose of DNA analysis to determine identification characteristics specific to the person as defined in subsection (a). After a determination by a magistrate or a grand jury that probable cause exists for the arrest, but prior to the person's release from custody, the arresting authority shall take the sample using a buccal swab collection kit for DNA testing. The biological specimen shall be collected by the arresting authority in accordance with the uniform procedures established by the Tennessee bureau of investigation, pursuant to § 38-6-113 and shall be forwarded by the arresting authority to the Tennessee bureau of investigation, which shall maintain the sample as provided in § 38-6-113. The court or magistrate shall make the provision of a specimen a condition of the person's release on bond or recognizance if bond or recognizance is granted.

(2) The clerk of the court in which the charges against a person described in subdivision (e)(1) are disposed of shall notify the Tennessee bureau of investigation of final disposition of the criminal proceedings. If the charge for which the sample was taken is dismissed or the defendant is acquitted at trial, then the bureau shall destroy the sample and all records of the sample; provided, that there is no other pending qualifying warrant or capias for an arrest or felony conviction that would otherwise require that the sample remain in the data bank.

(3) As used in this subsection (e), "violent felony" means:

. . . .

(D) Aggravated child abuse;

. . . .

(J) Rape, aggravated rape, rape of a child or aggravated rape of a child;

. . . .

Tenn. Code Ann. § 40-35-321(a), (e).

The Defendant maintains that Code section 40-35-321(e) does not require arrestees to be swabbed while in pretrial confinement. He claims that the second sentence in subsection (e)(1) qualifies the first sentence in that subsection and should be interpreted to mean that a DNA sample will be taken only prior to a defendant's release from custody. Specifically, he asserts that the qualifying language of "but prior to the person's release from custody" is "unambiguous" and "carries a plain meaning." Accordingly, the Defendant contends that the trial court erred in finding that his DNA would have been inevitably discovered pursuant to Code section 40-35-321(e) because "[t]his court must presume that the Tennessee General Assembly did not intend for a defendant charged with a "violent felony . . . to be obligated to provide a biological specimen for the purpose of DNA analysis until and unless the defendant attempts to be released from custody on bond."

In reviewing issues of statutory construction, which present questions of law, this court conducts a de novo review with no presumption of correctness. State v. Welch, 595 S.W.3d 615, 621 (Tenn. 2020) (citing State v. Dycus, 456 S.W.3d 918, 924 (Tenn. 2015)). "'The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" State v. Howard, 504 S.W.3d 260, 269 (Tenn. 2016) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). "We presume that each word in the statute has 'meaning and purpose, and should be given full effect if so doing does not violate the obvious intention of the Legislature.'" Powers v. State, 343 S.W.3d 36, 44 (Tenn. 2011) (quoting Waters v. Farr, 291 S.W.3d 873, 881 (Tenn. 2009)). In construing a particular statute, Tennessee law requires courts to avoid a construction that leads to absurd results. Welch, 595 S.W.3d at 621 (citing Tennessean v. Metro. Gov't of Nashville, 485 S.W.3d 857, 872 (Tenn. 2016)).

"When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language and, in that instance, we enforce the language without reference to the broader statutory intent, legislative history, or other sources." Carter v. Bell, 279 S.W.3d 560, 564 (Tenn. 2009). "A statute is ambiguous when 'the parties derive different interpretations from the statutory language.'" Welch, 595 S.W.3d at 622 (quoting Howard, 504 S.W.3d at 270). However, such differing interpretations must be reasonable before a statute is deemed ambiguous:

"[T]his proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of a statute. <u>A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute.</u>" In other words, both interpretations must be reasonable in order for an ambiguity to exist.

<u>State v. Frazier</u>, 558 S.W.3d 145, 152 (Tenn. 2018) (emphasis added) (quoting <u>Powers</u>, 343 S.W.3d at 50 n.20). If, however, the statute is ambiguous, this court "'may reference the broader statutory scheme, the history of the legislation, or other sources' to determine the statute's meaning." <u>Welch</u>, 595 S.W.3d at 622 (quoting <u>Frazier</u>, 558 S.W.3d at 152).

The plain language of Code section 40-35-321(e)(1) states that when a person is arrested for the commission of a violent felony "the person <u>shall have</u> a biological specimen taken for the purpose of DNA analysis to determine <u>identification characteristics</u> specific to the person. . . ." Tenn. Code Ann. § 40-35-321(e)(1). The language in the first sentence of subsection (e)(1) makes it mandatory for individuals arrested for violent felonies to have a specimen taken for the purpose of DNA analysis and explains that the purpose of the DNA analysis is to determine the arrestee's "identification characteristics." This sentence makes it clear that the DNA analysis is for identification purposes, like the process of fingerprinting a person during the booking process. <u>See</u> <u>Powers</u>, 343 S.W.3d at 45 (reiterating that "DNA typing has now replaced digital fingerprinting as the 'gold standard' of individualization in forensic science." (citation and internal quotation marks omitted)); <u>State v. Scarborough</u>, 201 S.W.3d 607, 619 (Tenn. 2006) (emphasizing that DNA analysis "serves as a form of 'fingerprinting' so as to provide a statistically precise method of identifying a single individual: a method that the subject cannot impugn by altering his or her appearance" (footnote omitted)); <u>Maryland v. King</u>, 569 U.S. 435, 450-56, 465-66 (2013) (holding that when officers make an arrest supported by probable cause to hold an individual for a serious offense and they bring the arrestee to the station to be detained in custody, obtaining and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under Fourth Amendment) (recognizing that DNA analysis of a cheek swab from arrestees helps (1) the Government identify who has been arrested and who is being tried; (2) ensure that custody of arrestee does not create risks for facility staff, the existing detainee population, and for a new detainee; (3) determine which arrestees would be more inclined to flee; (4) assess the danger the arrestee poses to the public; and (5) free individuals wrongfully imprisoned for a crime and apprehend criminals before they commit additional crimes).

The second sentence of (e)(1) states, "After a determination by a magistrate or a grand jury that probable cause exists for the arrest, but prior to the person's release from custody, the arresting authority shall take the sample using a buccal swab collection kit for DNA testing." Tenn. Code Ann. § 40-35-321(e)(1). We interpret this sentence, based on

its plain language, to mean that the arresting authority shall take a buccal swab after the determination is made that probable cause exists for the arrest but before the individual is released from custody, not that collection of the sample is contingent on a person's release from custody. This interpretation is supported by the last sentence of (e)(1), which provides, "The court or magistrate shall make the provision of a specimen a condition of the person's release on bond or recognizance if bond or recognizance is granted." Id. This last sentence recognizes that making the collection of a specimen for DNA analysis a condition of the persons' release simply ensures that the "identification characteristics" of the individual are obtained while that individual is still in custody. Although the Defendant argues that (e)(1) should be interpreted to mean that a buccal swab may not be taken "until and unless" the arrestee is released, we believe such an interpretation is "nonsensical" and unreasonable. Instead, the aforementioned phrase "but prior to the person's release from custody" merely provide "insurance" that individuals will not be released before their DNA is collected.

Even if we were to find that Code section § 40-35-321(e)(1) is somehow ambiguous, the legislative history does not support the Defendant's far-fetched interpretation of this statute. In the video recording of the March 6, 2007 hearing before the Sentence Judiciary Committee, Lieutenant Governor Ron Ramsey, one of the bill's sponsors, stated that this particular bill would help set up the DNA database by "collecting samples from people as they are arrested for certain crimes." Johnia Berry Act of 2007: Hearing on S.B. 1196 Before the Senate Judiciary Committee, 105th General Assembly (Mar. 6, 2007) (statement of Lieutenant Governor Ron Ramsey). During his remarks, Lieutenant Governor Ramsey recognized that DNA had become the "twentieth century fingerprint" for the purpose of identifying individuals. Id. Likewise, in the video recording from May 9, 2007, immediately prior to the vote on this bill, Representative Jason Mumpower, one of the sponsor's of this bill in the House, stated that the purpose of this bill was to "establish the first state-wide DNA database for people when they are arrested for certain violent felonies[.]" Johnia Berry Act of 2007: House Session, 38th Legislative Day (A), 105th General Assembly (May 9, 2007) (statement of Representative Jason Mumpower). Representative Mumpower also observed that DNA evidence was the "fingerprint of the future." Id. Neither Lieutenant Governor Ramsey nor Representative Mumpower made any statements indicating that the buccal swab would not be taken "until and unless" the arrestee was released. On the contrary, both lawmakers emphasized that DNA samples would be collected as individuals were arrested for certain violent felonies. The rationale that collecting DNA works like fingerprinting to identify the arrestees further supports the interpretation that DNA analysis should be conducted on all persons arrested for violent felonies, after a determination has been made by a magistrate or a grand jury that probable cause exists for the arrest. Accordingly, both the plain language in Code section § 40-35-321(e)(1) and the legislative history for this statute support the interpretation that the collection of buccal swabs for DNA analysis is required for all individuals arrested for

violent felonies on or after January 1, 2008, and this requirement is not contingent on whether such individuals are released from custody. Because Code section § 40-35-321(e) mandated that a buccal swab be collected from the Defendant for DNA analysis under the circumstances present in this case (i.e., when the Defendant was arrested pursuant to his arrest warrant for aggravated rape of a child and when he was indicted for both aggravated rape of a child and aggravated child abuse), we conclude that the trial court properly found that the Defendant's DNA would have been inevitably discovered pursuant to this statute.

**B. Constitutionality of Code section 40-35-321.** The Defendant contends that even if Code section 40-35-321(e) would have permitted the State to obtain a sample of his DNA upon his arrest, this court should conclude that Code section 40-35-321(e) is both facially unconstitutional and unconstitutional as applied to him. The State responds that the Defendant has waived this argument by failing to include it in his motion for new trial. see Lawrence v. Stanford, 655 S.W.2d 927, 929 (Tenn. 1983); State v. James Williams, W2017-01117-CCA-R3-CD, 2018 WL 1640078, at *3-4 (Tenn. Crim. App. Apr. 5, 2018). Moreover, it asserts that the Defendant cannot establish that the trial court committed plain error in admitting the DNA evidence in light of the alleged unconstitutionality of Code section 40-35-321(e) because there was no breach of a clear and unequivocal rule of law, because a substantial right of the accused was not adversely affected, and because consideration of the error is not necessary to do substantial justice. The State emphasizes that because the Defendant was the only male caregiver in the victim's household, and therefore was the only one who could have deposited the concentrated amount of semen in the rolled-up diaper, the evidence "unerringly pointed to the defendant as the perpetrator.

The Defendant claims that Code section 40-35-321(e)(1) is facially unconstitutional because it violates the prohibition against unreasonable searches and seizures provided in article I, section 7 of the Tennessee Constitution. He asserts that "the enactment of Tenn. Code Ann. § 40-35-321(e)(1) is nothing more than a veiled attempt on the part of the Tennessee General Assembly to circumvent the warrant requirement with respect to obtaining DNA samples from individuals who have been arrested for certain enumerated offenses." He adds that "[o]ther than [Maryland v. ]King's nonbinding precedent relative to Tennessee constitutional law," no other exception to the warrant requirement exists that would support searching him via a buccal swab and conducting DNA analysis for use as evidence to convict him of the offenses for which he was arrested. The Defendant contends that because Code section 40-35-321(e)(1) is unconstitutional, the trial court erred in concluding that his DNA would have been inevitably discovered by lawful means pursuant this statute.

The Defendant also claims that the second sentence in Code section 40-35-321(e)(1) makes this statute unconstitutional as applied to him because it is vague and ambiguous, if interpreted in the manner proposed by the State and applied by the trial court. He insists

- 25 -

that the second sentence of Code section 40-35-321(e)(1) requires an arrestee to attempt to make bond before the State is entitled to obtain a DNA sample, and because he never made or attempted to make his $1 million bond, the trial court erred in concluding that his DNA would have been inevitably discovered by lawful means pursuant to Code section 40-35-321(e)(1). He asserts that to the extent the first and second sentences of Code section 40-35-321(e)(1) cannot be reconciled, "the rule of lenity requires this Court to apply the ambiguity in the statute in a manner that is most favorable to [him]." For these reasons, the Defendant maintains that this Code section 40-35-321(e) is unconstitutional as applied to him and, consequently, that the trial court erred in concluding his DNA would have been inevitably discovered pursuant to this statute.

Initially, we note that the Defendant, in his motion for new trial, argued only that "the trial court erred by allowing DNA evidence and all lab test[s] and expert testimony pertaining to said DNA evidence to be admitted at trial after the court had ruled the DNA test performed on the defendant was not voluntary." The Defendant notably failed to include any claim in his motion for new trial that Code section 40-35-321 was facially unconstitutional or unconstitutional as applied to him. At the hearing immediately prior to the beginning of trial, defense counsel fleetingly argued that in order to make Code section 40-35-321(e) constitutional, the police had to "either get consent [for the DNA sample]" or "get a search warrant[127]" Defense counsel then compared the DNA evidence here to the "DUI cases where we were taking blood samples without consent[,]" and the United States Supreme Court held, "you got to get a search warrant."

In light of the Defendant's failure to include this specific issue in the motion for new trial and the United States Supreme Court's holding in Maryland v. King, 569 U.S. 435 (2013), which we will summarize below, we conclude that the defense's last-minute effort to block the admission of the Defendant's DNA by making this constitutional argument is insufficient to preserve this issue for review. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." (emphasis added)); Lawrence, 655 S.W.2d at 929 ("It has long been the general rule that questions not raised in the trial court will not be entertained on appeal and this rule applies to an attempt to make a constitutional attack upon the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion."); In re Adoption of E.N.R., 42 S.W.3d 26, 32 (Tenn. 2001) (recognizing that the trial court never adjudicated the defense's "last-ditch" argument regarding the constitutionality of the relevant statute and stating that "there is little difference between an issue improperly raised before the trial court at the last minute

- 26 -

and one that was not raised at all."). Accordingly, we conclude that any issue relating to the unconstitutionality of Code section 40-35-321 is waived on appeal unless it constitutes plain error.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (citations and internal quotations marks omitted). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

In considering whether the trial court committed plain error, we look to the Tennessee Supreme Court case of State v. Scarborough, 201 S.W.3d 607 (Tenn. 2006) and the United States Supreme Court case of Maryland v. King, 569 U.S. 435 (2013). In State v. Scarborough, 201 S.W.3d at 610-11, the Tennessee Supreme Court considered whether the collection of blood from a convicted and incarcerated felon for DNA analysis pursuant to Code section 40-35-321(b)[5] violated the Fourth Amendment to the United States Constitution or article I, section 7 of the Tennessee Constitution. First, the Court recognized that "the Fourth Amendment permits reasonable searches." Id. at 616. It then observed that some searches do not require a warrant, probable cause, or individualized suspicion in order to be reasonable:

---

[5] Code section 40-35-321(b) predated Code section 40-35-321(e)(1), which became effective on January 1, 2008.

> The United States Supreme Court has emphasized "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S. Ct. 1384, 103 L.Ed.2d 685 (1989); see also Skinner, 489 U.S. at 624, 109 S. Ct. 1402 (recognizing that "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable"); Illinois v. Lidster, 540 U.S. 419, 424, 124 S. Ct. 885, 157 L.Ed.2d 843 (2004) (acknowledging that "special law enforcement concerns will sometimes justify [seizures] without individualized suspicion"). Rather, "where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." Skinner, 489 U.S. at 624, 109 S. Ct. 1402.

Id. at 617. The court next recognized that prisoners have a diminished expectation of privacy, that the statute clearly and unambiguously specified the individuals who are subject to DNA collection and analysis, and that the government's interest in correctly identifying those who had broken its laws was weighty. Id. at 618-22. The Scarborough court then held that the taking of a blood sample from a convicted and incarcerated defendant and the subsequent DNA analysis of that sample, which were both conducted pursuant to Code section 40-35-321(b), were reasonable under the totality of the circumstances, and therefore, did not violate the Fourth Amendment to the United States Constitution. Id. at 622. After noting that article I, section 7 of the Tennessee Constitution was "identical in intent and purpose" with the Fourth Amendment to the United States Constitution, the court also held that the practice of obtaining a blood sample from a convicted and incarcerated defendant did not violate Scarborough's rights against unreasonable searches and seizures under the Tennessee Constitution. Id.

Several years later, in Maryland v. King, 569 U.S. at 441-444, the United States Supreme Court considered the constitutionality of a search authorized by the Maryland DNA Collection Act, which provided that all arrestees charged with serious offenses furnish a DNA sample through a buccal swab. The court noted that the "traditional standard of reasonableness" required the court "to weigh the promotion of legitimate governmental interests against the degree to which [the search] intrudes upon an individual's privacy." Id. at 448 (citation and internal quotation marks omitted). It stated that "[t]he legitimate government interest served by the Maryland DNA Collection Act" was "the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody." Id. at 449. The court recognized that a cheek swab was only minimally intrusive and that individuals who had

been arrested on probable cause for dangerous offenses had a reduced expectation of privacy. Id. at 461, 463. The court also acknowledged that a buccal swab like the one in this case did "not increase the indignity already attendant to normal incidents of arrest" and that "the processing of respondent's DNA sample[] did not intrude on respondent's privacy in a way that would make his DNA identification unconstitutional." Id. at 464. Ultimately, the King court held that both the taking of a buccal swab following an arrest for a serious offense and the subsequent DNA analysis of that buccal swab were reasonable under the Fourth Amendment:

> When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

Id. at 465-66.

In light of Scarborough and King, the Defendant has failed to show that the trial court committed plain error by admitting the DNA evidence. Code section 40-35-321(e) specifies that DNA analysis of the sample is conducted to determine the "identification characteristics" of all individuals arrested for violent felonies. The State argues, and we agree, that if the Defendant's fingerprints, taken during the booking process, had matched fingerprints found on the diaper, then the Defendant could not have complained. We see no difference between DNA and fingerprints in this context. Moreover, a buccal swab collected pursuant to Code section 40-35-321(e) is not dependent on any officer's or jailer's decision to invade his privacy; instead, a buccal swab is collected from all individuals who have been arrested for certain specified violent felonies, so long as a magistrate or a grand jury has determined that probable cause exists for the arrest. See Scarborough, 201 S.W.3d at 619. Code section 40-35-321(e)(1), like the other subsections in that statute, "allows for no discretion as to who will be required to provide a specimen." Id. at 620; see State v. Crank, 468 S.W.3d 15, 25 n.5 (Tenn. 2015) (distinguishing between "a facial challenge, which involves the constitutionality of the statute as written, [and] [a]n as applied challenge to the constitutionality of a statute[, which] is evaluated [by] considering how it operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations" (citations and internal quotation marks omitted)). We conclude that the Defendant has failed to show that the trial court committed plain error in admitting the DNA evidence after determining that it would have been inevitably discovered pursuant to Code section 40-35-321(e). Because no clear and unequivocal rule of law was breached, because a substantial right of the accused was not adversely affected, and because consideration of the error is not necessary to do substantial justice, the Defendant is not entitled to plain error relief.

- 29 -

**C. Inevitable Discovery of DNA Proof Pursuant to Search Warrant.** Third, the Defendant maintains that the inevitable discovery doctrine does not apply because although the State <u>could have</u> obtained his DNA via a search warrant prior to trial, there was no evidence to show that the State <u>would have</u> done this. He asserts that because the State could have obtained a search warrant and ultimately failed to do so, this court should conclude that the inevitable discovery doctrine does not provide a basis for admitting his DNA, and the related expert DNA testimony, into evidence.

The Defendant contends that the State had more than enough time to obtain a search warrant for his DNA prior to trial, and should have done so, rather than "s[itting] on its hands and unwisely rel[ying] on its now-defunct belief that [he] voluntarily, knowingly, and intelligently consented to providing his DNA when he did not." He asserts that the State should not be given the benefit of violating his constitutional right to refuse to provide his DNA and then be allowed to argue, after this violation has been established, that the State's constitutional violation should be excused simply because the State allegedly "would have" obtained a search warrant. We observe that the first time the State became aware that the Defendant intended to challenge his consent to have his DNA collected was at the hearing on February 6, 2020, exactly four days prior to trial. When the trial court heard additional argument on this issue immediately before the start of trial on February 10, 2020, the State noted that the trial court could grant a search warrant for the Defendant's DNA "right now" and it could be "sent to the TBI, but that would require a continuance." We conclude that because the State was reasonably relying on the Defendant's consent for the DNA swab until defense counsel, on February 6, challenged this consent following the trial court's suppression of the Defendant's statements, the State did not err in failing to obtain the Defendant's DNA via a search warrant prior to trial.

Second, the Defendant insists that the State's claim, supported by Lieutenant Grooms' testimony, that it "would have" obtained a search warrant for the Defendant's DNA should be rejected in light of "the State's unfettered, misplaced reliance on the applicability of Tenn. Code Ann. 40-35-321(e)(1) to this case." He notes that at the pretrial hearing on February 10, 2020, the State asserted "its erroneous belief that a defendant is automatically required to be swabbed for the presence of DNA when he or she is arrested for a "violent felony" as defined in Tenn. Code Ann. § 40-35-321(e)(3). The Defendant contends that if the State believes that a sample of the Defendant's DNA is automatically required to be collected upon his arrest for a "violent felony," then "it makes absolutely zero sense that the State 'would have' also obtained a search warrant" for the Defendant's DNA. He claims that "[t]o hold otherwise is to permit the State to proverbially have its cake and eat it, too." We have already concluded that the Defendant's DNA would have been inevitably discovered pursuant to Code section 40-35-321(e)(3). However, as we will explain below, the Defendant's DNA also would have been inevitably discovered pursuant to a search warrant. The State was not forced to choose one option over the other and was

free to rely on any untainted, independent avenue to obtain the Defendant's DNA pursuant to the inevitable discovery doctrine.

Third, the Defendant contends that allowing the State to rely on the inevitable discovery doctrine in his case is "'untenable'" because it would "'completely obviate the warrant requirement.'" Scott, 619 S.W.3d at 205 (citing Quinney, 583 F.3d at 894) (quoting Haddix, 239 F.3d at 768). He notes the Scott court fully agreed with the Sixth Circuit line of cases, which "reject[ed] the argument that the inevitable discovery doctrine applies in cases when law enforcement had probable cause to obtain a search warrant but simply failed to do so." Id. The Defendant insists that in his case, just as in Quinney and Haddix, law enforcement had probable cause to obtain a search warrant for his DNA and failed to do so. In the instant case, the State reasonably relied on the Defendant's consent for his DNA swab until the defense revealed, just a few days prior to trial, that it was going to challenge this consent following the trial court's suppression of the Defendant's statements during his interviews. In both Haddix and Quinney, the police conducted warrantless searches but never had an independent, untainted investigation that inevitably would have uncovered the same evidence. See Haddix, 239 F.3d at 768-69 (noting that "[t]he record of the instant case includes no indication that the police were investigating Haddix independently of the chance fly-over giving rise to his arrest."); Quinney, 583 F.3d at 894 (recognizing that "the agents in the present case had probable cause, based on the statements of two witnesses, to obtain a search warrant for the seizure of the printer" and that "instead of actually obtaining a warrant, they seized the printer without one"). We conclude that the Defendant's case is distinguishable from both Haddix and Quinney. Here, there were two lawful avenues for obtaining the Defendant's DNA that were independent of the tainted consent: (1) Code section 40-35-321(e), and (2) a search warrant for the Defendant's DNA following the TBI's discovery of blood and semen on the diaper.

Because we have already discussed the legitimacy of relying on Code section 40-35-321(e), we will briefly discuss how obtaining a search warrant for the Defendant's DNA also provides a lawful avenue that was independent of the earlier, tainted consent in this case. At the time that the victim was admitted to the hospital for his injuries, the Defendant was the only male caregiver for the victim. The record shows that both the Defendant and his wife, Danielle Bowen, consented to the search of their home. Even if the validity of the Defendant's consent could be challenged, the record indicates that Bowen's consent to the search of the home was valid. When officers searched the home pursuant to this consent, Detective Grooms collected the Defendant's and Bowen's city garbage can, wherein he later discovered what appeared to be a bloody diaper. TBI testing revealed that this diaper contained not only blood but also a high concentration of semen, which provided the police with probable cause to obtain a search warrant for the DNA of the Defendant, who was the only male caregiver living at that address. Bowen's lawful consent to search the home, which led to the discovery of the diaper that provided probable cause for a search

warrant for the Defendant's DNA, was completely independent of the Defendant's tainted consent to provide his DNA through a buccal swab. See Johnson, 22 F.3d at 684 (noting that both an "independent line of investigation" and "compelling facts" can show that the evidence would have inevitably been discovered). The record here shows that if the Defendant had refused to consent to a buccal swab of his DNA, the Defendant's DNA would have undoubtedly been obtained either pursuant to a search warrant or pursuant to Code section 40-35-321(e). In fact, the only reason the Defendant's DNA was not obtained pursuant to a warrant or to Code section 40-35-321(e) was because the Defendant consented to providing his DNA during the first interview, even though his consent was later found to be invalid. See United States v. Elvin Wrensford, No. 2013-0003, 2019 WL 3842860, at *9 (V.I. Aug. 15, 2019) ("The absence of any effort by law enforcement to obtain a warrant is attributable to Wrensford's provision of consent, which obviated the need for a warrant."). Detective Grooms clearly testified that he obtained a search warrant for the Defendant's truck and his cell phone records and that he would have been able to obtain a search warrant for the Defendant's DNA "[q]uite quickly" once the TBI determined that there was semen on the diaper. In fact, it would have been reasonable for the police to obtain a search warrant for the Defendant's DNA, even if this DNA had been obtained pursuant to Code section 40-35-321(e), in order to doubly confirm that the Defendant's DNA matched the DNA of the semen on the diaper. Such confirmation DNA tests, especially for the purposes of trial, are not unusual. Because the record is sufficient to show by a preponderance of the evidence that the Defendant's DNA would have been inevitably discovered, either pursuant to a search warrant or pursuant to Code section 40-35-321(e) or pursuant to both of these lawful avenues, we conclude that the trial court did not err in denying the Defendant's motion to suppress the DNA evidence in this case.

**II.  Admission of Photographs.**  The Defendant also contends that the trial court abused its discretion in allowing the State to introduce five photographs depicting the injuries to the victim's anus and rectum. While he acknowledges that these photographs, individually and collectively, accurately depicted the victim's physical condition when it was first discovered, he nevertheless asserts that "the inflammatory, unfairly prejudicial, and needlessly cumulative nature of these photographs substantially outweighed any probative value of the photographs as evidence." He also claims that testimonial evidence regarding the nature and extent of the victim's injuries would have been more than sufficient to relate the facts of the case to the jury. Lastly, he asserts that even if the State was entitled to show the jury at least one photograph of the victim's injuries, there was no need to admit all five photographs. For all of these reasons, the Defendant argues that his convictions should be reversed and vacated and that his case should be remanded for a new trial. The State counters that the Defendant cannot show that the trial court abused its discretion in admitting these photographs, given that causation of the victim's injury was a contested issue at trial. We agree with the State.

At the February 6, 2020 hearing, the State asked the trial court to consider the admissibility of fifteen photographs depicting the injuries to the victim's anus and rectum. The Defendant immediately made a "blanket objection" to all fifteen photographs on the basis that they were "repetitive" and that the probative value was outweighed by the "prejudicial" nature of the photographs. After carefully considering all fifteen photographs, the trial court denied the defense's motion to exclude all the photographs, finding that admission of some photographs was "necessary for the jury to understand the full impact and full injuries" sustained by the victim. Turning to the defense's motion to limit the number of photographs admitted, the trial court stated that it was "inclined to have the jury look at these five [photographs]." Defense counsel acknowledged, "notwithstanding [his] original objection," that two of the photographs would be sufficient to allow an expert to testify about the "bruising, laceration, and tissue [injury]" sustained by the victim. Ultimately, the trial court determined that all five photographs of the victim's injuries were admissible because "their probative value substantially outweigh[ed] their prejudicial effect."

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility." State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000).

To be admissible, all evidence, including photographs, must be relevant to an issue the jury must decide. State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Notes).

When determining the admissibility of relevant photographic evidence, the trial court should consider "[the photographs'] accuracy and clarity, . . . the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to

- 33 -

establish a prima facie case of guilt or to rebut the defendant's contentions." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id. If photographs do not add anything to the testimonial descriptions, they may be excluded. Id. In addition, if the defense offers to stipulate to the facts shown in a photograph or never disputes the testimony that the photograph illustrates, then admission of the photograph itself may not be justified. Id. Nevertheless, "a relevant photograph is not rendered inadmissible merely because it is cumulative." State v. Morris, 24 S.W.3d 788, 811 (Tenn. 2000); see State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993) (holding that despite the admission of a color videotape showing the victim's bodies, the color photographs of the deceased victims were not "unnecessarily cumulative"); State v. Brown, 836 S.W.2d 530, 551 (Tenn. 1992) (holding that the nine photographs of the victim's body were admissible, despite testimony graphically describing the victim's injuries, because the photographs established "the brutality of the attack and the extent of the force used against the victim").

We conclude that the five photographs admitted at trial were relevant and that the probative value of these photographs was not substantially outweighed by the danger of unfair prejudice. These photographs depicted the severe injuries to the victim's anus and rectum, which included two lacerations, debilitating muscle relaxation that nearly required the victim to have a colostomy bag for life, and extensive bruising. Nurse Practitioner Leanna Dugan relied on all five photographs to illustrate and explain each of the victim's injuries at trial. In order to prove the elements of the charged offenses, the State was required to prove that the Defendant intentionally, knowingly, or recklessly had unlawful sexual penetration of the victim for count one and that the Defendant knowingly, other than by accidental means, treated the victim in such as manner as to inflict serious bodily injury for count two. The admitted photographs, which depicted the brutality of the offenses and the nature and extent of the victim's injuries, were particularly probative of these issues. The defense theory at trial was that the Defendant accidentally injured the victim when he used his finger to remove stool while the victim was constipated. These five photographs supported the State's argument that this was not an accidental injury to the victim and that the Defendant was, in fact, guilty of aggravated rape of a child and aggravated child abuse.

As to the Defendant's claim that all five of these photographs should not have been admitted, we note that these photographs were not cumulative to each other or to the other evidence presented at trial, including the reports and testimony from the State's expert witnesses. The admitted photographs depicted the severity of the victim's injuries from different perspectives, which assisted the jury in determining whether the Defendant's explanation for the victim's extensive injuries was credible. In light of the defense theory at trial that the Defendant inflicted the victim's injuries accidentally, there is no indication that the "primary purpose" of these photographs was "to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim.

App. 1998) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)). The primary issue at trial was whether the victim's anal and rectal injuries and leg fractures were from the Defendant's sodomizing the victim. Because testimony alone would have fallen woefully short of demonstrating the acute severity of the victim's injuries and because causation was the key issue at trial, we conclude that the probative value of these photographs was not substantially outweighed by the danger of unfair prejudice and that the trial court did not abuse its discretion in admitting them.

Even if the trial court's admission of all five photographs was in some way error, it most certainly did not affect the verdict in this case. See State v. Martin, 964 S.W.2d 564, 568 (Tenn. 1998) ("A violation of an evidentiary rule may not mandate reversal if the error 'was more probably than not harmless.'" (quoting United States v. Barrett, 703 F.2d 1076, 1081-82 (9th Cir. 1983)); Tenn. R. Crim. P. 52(a) ("No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on its merits."); Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). As the Tennessee Supreme Court recognized:

> Whether error in the admission of evidence is prejudicial is gauged by the substance of the evidence, its relation to other evidence, and the peculiar facts and circumstances of the case, and whether such admission is sufficient ground for reversal depends on the facts in each case; and the appellate court will consider the record as a whole in determining the question of prejudice or reversibility.

Blankenship v. State, 410 S.W.2d 159, 161 (Tenn. 1966) (quoting 24B C.J.S. Criminal Law § 1915(2)). Here, the proof conclusively established that the Defendant was the only male caregiver for the victim during the relevant time period and that a diaper containing a high concentration of semen, which matched the Defendant's DNA, was collected behind the Defendant's home. The Defendant is not entitled to relief on this issue.

**III. Sufficiency of the Evidence.** The Defendant also argues that the evidence is insufficient to sustain his convictions for aggravated rape of a child and aggravated child abuse and that his convictions should be reversed and vacated and his case dismissed. The State responds that it presented overwhelming proof to support the Defendant's convictions. We conclude that the evidence is sufficient to sustain both convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that

- 35 -

the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Regarding the conviction for aggravated rape of a child, the Defendant contends that the State failed to present sufficient evidence establishing that he "intentionally, knowingly, or recklessly penetrated [the victim's] bottom in a sexual manner." He claims that aside from his own testimony, no other witnesses testified with "direct, personal knowledge" as to how the injuries to the victim were sustained and that no other witnesses testified that they personally observed him anally penetrating the victim in a sexual manner. He also notes that although Agent Kennedy testified that the Defendant's semen was found in the victim's diaper, Agent Kennedy also acknowledged that the victim's perianal swabs tested negative for the presence of semen. Additionally, he asserts that while Agent Sulpy testified that it was "unlikely" that semen from the baby wipe would transfer to the diaper while both items were soaking in a wet trash can for a long period of time, Agent Sulphy's testimony did not completely rule out such a possibility.

As charged in this case, aggravated rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is three (3) years of age or less." Tenn. Code Ann. § 39-13-531(a) (Supp. 2018). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7). In order to find a defendant guilty of aggravated rape of a child, the State must prove beyond a reasonable doubt: (1) that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant; (2) that the alleged victim was three (3) years of age or less; and (3) that the defendant acted either intentionally, knowingly or recklessly. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 10.12.

The proof at trial conclusively established that the Defendant was the only male caregiver of his sixteen-month-old son, who was so severely sodomized that his injuries required surgical intervention. A rolled up diaper containing a high concentration of semen and the victim's blood was found in a trash can just outside the Defendant's home. TBI testing established that the semen in the diaper matched the Defendant's DNA. Given the overwhelming evidence of guilt presented at trial, a rational jury could have found beyond a reasonable doubt that the Defendant intentionally, knowingly, or recklessly engaged in the unlawful sexual penetration of the victim, who was three years of age or less. We conclude the evidence is more than sufficient to sustain the Defendant's conviction for aggravated rape of a child.

Regarding the conviction for aggravated child abuse, the Defendant argues that the State failed to establish that the victim's anal and rectal injuries constituted "serious bodily injury" or that the Defendant caused the corner fractures to the victim's legs on or about November 11, 2018. While he acknowledges that the victim sustained a laceration, bruising, and muscle relaxation, he argues that the laceration and muscle relaxation would not constitute "serious bodily injury" pursuant to Code section 39-15-402(c) and that the bruising was not severe enough to constitute "serious bodily injury" under that statute. The Defendant also asserts that Dr. Williams' testimony, wherein she admitted she could not provide a specific date that these corner fractures occurred, left the jury to "speculate impermissibly that [the Defendant] caused the corner fractures to [the victim] on or about November 11, 2018."

As relevant here, "[a] person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child[.]" Tenn. Code Ann. § 39-15-402(a)(1) (Supp. 2018). "[I]f the abused . . . child is eight (8) years of age or less, . . . the penalty is a Class A felony." Id. § 39-15-402(b). A person commits child abuse "who knowingly, other than

- 37 -

by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury[.]" Id. § 39-15-401(a) (Supp. 2018). "'Serious bodily injury to the child' includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." Id. § 39-15-402(c) (Supp. 2018) (emphasis added). In order to find a defendant guilty of aggravated child abuse, the State must prove beyond a reasonable doubt: (1) that the defendant knowingly, other than by accidental means, treated a child in such a manner as to inflict injury; (2) that the act of abuse resulted in serious bodily injury to the child; and (3) that the child was eight (8) years of age or less. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 21.01.

As to the Defendant's claim that the victim's anal and rectal injuries did not constitute "serious bodily injury" for his aggravated child abuse conviction, Nurse Practitioner Leanna Dugan testified that the victim sustained such severe injuries to his anus and rectum that the victim refused to cooperate with a physical exam. She stated that the victim had both a deep penetrating laceration as well as a shallow laceration to his rectal area, substantial bruising, and severe muscle relaxation around his anus. Although the Defendant contends that the victim's lacerations and muscle relaxation would not constitute "serious bodily injury" and that the bruising was not severe enough to constitute "serious bodily injury," we strongly disagree and conclude that each of these injuries constituted serious bodily injury for this offense. Although Code section 39-15-402(c) provides some specific examples of the types of injuries that would constitute serious bodily injury, the statute explicitly acknowledges that this list is not exclusive. Because the evidence overwhelmingly established that the victim sustained horrific anal and rectal injuries, a rational jury could have easily found that the victim sustained serious bodily injury based on these injuries alone.

We next address the Defendant's claim that the inability to date the victim's corner fractures meant there was no proof that he inflicted these injuries on or about November 11, 2018. Dr. Williams testified at trial that the victim's leg fractures were very rare and generally occurred during a forceful yanking. She also stated that the victim's anal and rectal trauma was consistent with child sexual abuse and that the victim's corner fractures, absent a "very clear, exceedingly rare accidental history," were consistent with physical abuse of a child. Dr. Williams opined that neither a fall in a bathtub nor anything in the victim's medical history explained the victim's corner fractures. This proof, along with the medical evidence presented at trial, leads to the strong inference that the Defendant caused the corner fractures when he committed the aggravated rape of the victim. We also fully agree with the State's assertion that the jury could have reasonably inferred guilt from the Defendant's actions in fleeing to another state after his first interview with police, in

hiding his truck in the woods so it would not be discovered, and in failing to provide any corroborating proof that he was working for a plumber in Alabama. Given the evidence presented at trial, a rational jury could have found that the Defendant forcibly grabbed the victim by his legs in order to sexually penetrate him, which resulted in the severe injuries to the victim's anus and rectum as well as the corner fractures to the victim's legs. Accordingly, we also conclude the evidence is more than sufficient to sustain the Defendant's conviction for aggravated child abuse.

      **IV. <u>Consecutive Sentencing.</u>** The Defendant argues that the trial court abused its discretion when it ordered his twenty-five-year sentence for aggravated child abuse served consecutively to his sixty-year sentence for aggravated rape of a child. He urges this court to reverse the trial court's imposition of consecutive sentencing and order his sentences served concurrently. While the Defendant acknowledges that the offenses of aggravated rape of a child and aggravated child abuse are "two of the most serious crimes punishable under Tennessee law," he nevertheless asserts the record does not support the trial court's finding that he committed these two crimes when "the risk to [the victim's] life was high." He claims that the victim was never at risk of dying and that the victim's injuries had healed by the time of the sentencing hearing. The State counters that the trial court properly found that the Defendant's behavior, in sodomizing his own son and breaking his son's legs in the process, showed a blatant disregard for human life and that the Defendant posed a threat to the public. We conclude that the trial court did not abuse its discretion in imposing consecutive sentencing that resulted in the Defendant's effective eighty-five-year sentence.

      In <u>Pollard</u>, the Tennessee Supreme Court held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." <u>State v. Pollard</u>, 432 S.W.3d 851, 860 (Tenn. 2013); <u>see</u> <u>State v. Bise</u>, 380 S.W.3d 682, 708 (Tenn. 2012); <u>State v. Caudle</u>, 388 S.W.3d 273, 278-79 (Tenn. 2012). The court explained that "the presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" <u>Pollard</u>, 432 S.W.3d at 861. It reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." <u>Id.</u> at 862 (citing <u>State v. Dickson</u>, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." <u>Id.</u> (citing Tenn. R. Crim. P. 32(c)(1); <u>Bise</u>, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to

achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, the trial court imposed consecutive sentencing after finding that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high [XI, 40]. See Tenn. Code Ann. § 40-35-115(b)(4). The Pollard court explained that two additional findings must be made when applying the dangerous offender classification:

> "Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences."

Pollard, 432 S.W.3d at 863 (quoting Wilkerson, 905 S.W.2d at 938). Therefore, when imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must conclude that the proof has established that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts[.]" Id. (quoting Wilkerson, 905 S.W.2d at 938). Unlike the other six subsections, the trial court must make additional findings for the dangerous offender classification because it is "the most subjective and hardest to apply." State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In this case, the trial court determined that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The court also made the additional findings required by Wilkerson, specifically stating that "consecutive sentencing is reasonably related to the severity of the offenses committed" and that "an extended sentence is necessary to protect society against further criminal conduct of this defendant." The trial court considered the testimony from three of the State's witnesses before stating that the Defendant caused horrific injuries to the victim, including "a tear so deep that it

- 40 -

required surgery . . . in addition to fracturing both of his [legs]. It recognized that the Defendant also "ejaculated in his baby," which the Defendant did to "gratify his desire for pleasure or excitement" The trial court also determined that the Defendant abused a position of trust and that the victim in this case was vulnerable and "unable to summon help." The court found that the circumstances of the offenses were aggravated, that confinement for an extended time was necessary to protect society, and that the aggregate length of the sentences reasonably related to the offenses of which the Defendant stood convicted. The court determined that the Defendant was "100 percent not credible" and that the Defendant had failed to accept responsibility for the victim's serious injuries. The trial court stated that it was "appalled" by the "Strong R" assessment's determination that the Defendant was at a low risk to reoffend; the court then dismissed each and every one of the findings made in this assessment.

The Defendant specifically claims the record does not support the trial court's finding that he committed these two crimes when "the risk to [the victim's] life was high." He asserts that the victim was never at risk of dying and that the victim's injuries had healed by the time of the sentencing hearing. We conclude that the Defendant in this case had absolutely no hesitation about committing a crime in which the risk to human life was high. The victim's horrific injuries included a deep, penetrating laceration, a second shallow laceration, debilitating muscle relaxation that nearly required the victim to have a colostomy bag for life, extensive bruising, and fractures to both legs. After the Defendant violently sodomized his sixteen-month old son, the victim bled profusely, as shown by the blood soaked diaper that was admitted into evidence. After inflicting these horrendous injuries, the Defendant kept the victim from Lura McCandless for several days, which delayed the victim's surgery and other necessary medical treatment. When the Defendant and Bowen appeared at the hospital, the Defendant never asked about the victim's health and seemed unconcerned about the victim's condition. Despite the Defendant's claims to the contrary, this record clearly and definitively supports the trial court's determination that the Defendant is a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(4). Moreover, the record supports the trial court's findings that the terms imposed in this case were reasonably related to the severity of the offenses committed and were necessary in order to protect the public from further criminal acts by the Defendant. See Pollard, 432 S.W.3d at 863. Accordingly, we conclude that the trial court did not abuse its discretion in ordering the Defendant's twenty-five-year sentence for aggravated child abuse served consecutively to his sixty-year sentence for aggravated rape of a child, for an effective sentence of eighty-five years. The Defendant is not entitled to relief.

## CONCLUSION

We conclude that the trial court did not err in admitting the DNA evidence at trial, that the trial court did not abuse its discretion in admitting photographs of the victim's injuries, that the evidence is sufficient to sustain both of the Defendant's convictions, and that the trial court did not abuse its discretion in imposing consecutive sentencing in this case. Accordingly, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE